## HUMBLE OIL & REFINING CO. v. TRAPP et al.

### No. 9535.

Court of Civil Appeals of Texas. Austin.

Feb. 27, 1946.

Rehearing Denied May 1, 1946.

Second Motion for Rehearing Denied May 22, 1946.

Rex G. Baker and Nelson Jones, both of Houston, and Powell, Wirtz, Rauhut & Gideon, J. A. Rauhut, and W. S. Gideon, all of Austin, for appellant.

Polk Shelton, Looney & Clark, Everett L. Looney, and Chas. F. Herring, all of Austin, for appellees Trapp and Blankenship.

Grover Sellers, Atty. Gen., and James L. Noel and Harris Toler, Asst. Attys. Gen., for appellee Railroad Commission and others.

BAUGH, Justice.

·This is a Rule 37 case. Suit was by the Humble to cancel a permit granted by the Railroad Commission to G. T. Blankenship to drill a second well on a 2.08-acre tract of land located in the west edge of the fairway of the East Texas oil field in Gregg County; and to enjoin production from said well which had been drilled thereunder. The permit, dated February 28, 1941, was granted by Commissioners Thompson and Sadler, Culberson dissenting, on the recited grounds to prevent confiscation and waste. Trapp was made a party to the suit as owner of a half interest in the lease. The defendants, Trapp and Blankenship, pleaded in defense, among other things, an unreasonable delay by Humble amounting to laches, in filing and prosecuting its suit to cancel the permit; and a prior agreement by Humble's attorney with Trapp not to sue, on which he relied to his prejudice. The case was submitted to a jury on special issues in response to which the jury found:

1. That Humble delayed for an unreasonable time in bringing suit to cancel said permit;

2. That by reason of such delay Trapp and Blankenship incurred heavy expense which they otherwise would not have incurred;

3. That in May, 1937, the attorney for the Humble, in consideration of the dismissal by Trapp of his cross-action against the Humble in a suit by Humble then pending involving a permit on another tract of land in the East Texas field, agreed that Humble "would not thereafter interfere by suits or otherwise with M. E. Trapp in his drilling and producing oil from such leases in East Texas in which he was an owner"; and

4. That Trapp drilled the well in question relying in good faith on such agreement.

· The trial court thereupon rendered judgment that the Humble take nothing by its suit; hence this appeal.

The issues as to whether ·the well was necessary, as an exception to Rule 37, to prevent either confiscation or waste were not submitted to the jury nor requested by appellant, whose duty it was, of course, to make such proof. And it is the contention of appellees that there was evidence to sustain the permit on these grounds; and appellant not having requested that such issues be submitted, it waived them under Rule 279, T.R.C.P., and that the trial court's judgment should therefore be sustained, regardless of the special issues submitted.

However, an examination of the uncontroverted evidence in the light of

prior decisions discloses, we think, that as a matter of law the permit cannot be sustained on either of the grounds on which it was granted. The tract in question is located in one of the best producing areas in the field. It is rectangular in shape, approximately 246 feet wide, north-south, and approximately 347 feet long, east-west. Well No. 1 thereon, drilled in 1931, is located in the center thereof, 126 feet from its south boundary. Well No. 2, the one here involved, is located 80 feet south of well No. 1. Without well No. 2, there was no uncompensated drainage from said tract. The eight times surrounding area delineated by a rectangle superimposed on said tract, and including well No. 1, contains 8 wells. The eight times surrounding area delineated by a circle with well No. 1 as the center contains 7 wells. The underground conditions, i. e. sand thickness, porosity, permeability, bottom hole pressure, well potentials, and daily allowable production per well—were substantially uniform for such areas; as was the daily production per acre therefrom. The testimony of geologists was that one well on said tract would produce the recoverable oil in place beneath said tract and such oil as would naturally migrate to it. While the witnesses did testify that there was a theory advanced that on the issue of waste of "more wells, more oil" production; and that there were other wells than those in the eight times area within 660 feet (the spacings established by Rule 37) of said tract; such wells did not cause uncompensated drainage from such 2.08-acre tract; and the "more wells, more oil" theory as a waste prevention measure has already been adjudicated adversely to such contention. Without further discussion, under the uncontroverted facts as stated above, and the adjudicated cases, said permit cannot as a matter of law be sustained on the grounds on which it was granted; and that failure to submit such issues to the jury will not support the judgment on the grounds of waiver under Rule 279, T.C.R. P. See Railroad Comm. v. Magnolia Pet. Co., Tex.Civ.App., 169 S.W.2d 253; Trapp v. Atlantic Ref. Co., Tex.Civ.App., 169 S. W.2d 797, writ refused; Gulf Land Co. v. Atlantic Ref. Co., 134 Tex. 59, 131 S.W.2d 73; Railroad Comm. v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022; Holcomb v. Atlantic Ref. Co., Tex.Civ.App., 172 S.W. 2d 523. We think it is also clear that the case was tried on the theory of laches and estoppel as submitted to the jury.

■■ Considering next the efficacy of the agreement pleaded by appellees, testified to by Trapp and found by the jury to have been made in May, 1937, as barring Humble's right to set aside the permit here involved; we have concluded that not only is it void and unenforcible because too uncertain and indefinite; but even if valid, it did not, under Trapp's own testimony, apply to the tract of land here involved. That purported agreement grew out of a suit filed by the Humble against Trapp on May 31, 1935, being cause No. 55,598, in the District Court of Travis County, Texas, to set aside and cancel a permit theretofore granted to Trapp to drill a second well on a one acre tract in said field in Gregg County. By supplemental answer and cross-action filed in that suit on March 12, 1937, Trapp alleged that the Humble had been running excess oil from its offset wells on its adjoining tract to the injury of his wells on the one acre tract, causing low pressure conditions in that immediate area, and prayed that further production from Humble's wells be enjoined until such lowered bottom hole pressure could be equalized in the surrounding area.

After negotiations with reference to that suit, both the plaintiff's (Humble) suit and Trapp's cross-action were dismissed "with prejudice" to their being refiled; and the order of dismissal was approved in writing by the attorney for Humble and the attorney for Trapp. The order of dismissal in nowise refers to nor indicates any agreement. The purported agreement, denied by Rauhut, attorney for Humble, and asserted by Trapp, was oral and made by long distance telephone between them as a part of the negotiations for dismissal of cause No. 55,598. Trapp's testimony with reference to the matter was as follows:

"Mr. Rauhut insisted upon dismissing it and wanted to know what I wanted him to do. He said, 'We don't want to try the

law suit, and we will do anything you want us to do; that we can not win the law suit and want to have it dismissed and disposed of, and what do you want us to do.' I was somewhat of the opinion that the cross action ought to have been tried, but he was very nice about it and said if we would dismiss it they would pay the costs in the matter and hold me harmless from any expense by reason of it, and he agreed then not to bring any more actions against me or interfere with my operations in the field. That if they had any grievance they would see me personally about it and thrash it out personally without jumping into court on each occasion that occurred; and under those circumstances I told him to tell Mr. Pollard I would agree to dismiss it on those terms. Later I called Mr. Pollard and told him I had talked to Mr. Rauhut about it and Mr. Rauhut had agreed that they would not annoy me or interfere with my operations in the East Texas Field any further, and that we would get along.

"Q. Now Governor, does that correctly state the agreement you had with Mr. Rauhut? A. Yes, sir.

* * * * * *

"Q. Now following that dismissal of your cross action, did you secure any additional permits in East Texas? A. Yes, sir, that was part of the agreement at that time. I called his attention to the fact that I was preparing to apply for additional permits, and that he agreed not to oppose those permits—or at least he agreed not to go into court."

On cross-examination Trapp further testified that in his conversation with Rauhut "There was not anything said necessarily about the confining it" (the agreement) to East Texas. He later limited the scope of the agreement to the East Texas field.

Further: "Q. First it was limited to the East Texas oil fields and second it was limited to the leases you owned or had an interest in? A. In the East Texas oil field yes." Again: "It was a telephone conversation and it was brief and I do not recall of anything being said about that (after acquired leases). In fact I am sure

there was no question of any additional lease that I might acquire." "I think it was sufficiently broad to cover any lease I might thereafter acquire. Nothing was said necessarily."

It is not controverted that the lease involved in this suit was not acquired by Trapp until some six months after the purported agreement was made.

Consequently the permit here involved did not, under Trapp's own testimony, come within the terms of such agreement. There was no evidence that Humble knew or was informed by Trapp what leases he then owned in whole or in part in the East Texas field. The Humble was not required under its terms to do anything affirmatively. Nor was any time limit fixed for which the agreement was to run, and no terms stated upon which damages for breach of such agreement could be computed or arrived at. As stated in 12 Am.Jur., § 64, p. 555: "The terms and conditions are not sufficiently definite unless the court can determine therefrom the measure of damages in case of a breach." Further, that in order to be binding such an agreement "must be sufficiently definite to enable the court to determine its exact meaning and fix definitely the legal liability of the parties." See also 10 Tex.Jur., § 101, p. 175. It is obvious we think that not only was the purported agreement asserted by Trapp invalid because too indefinite to be enforcible; but that if it were valid it did not, under Trapp's own testimony, include nor apply to the leasehold here involved. This conclusion renders unnecessary discussion of appellant's contention made at length that such agreement was void because contrary to public policy.

The next issue presented is that of laches by Humble in that it "delayed for an unreasonable time the bringing of this suit"; and that by reason thereof the appellees "incurred heavy expense which they otherwise would not have incurred"; thus estopping the Humble from attacking the validity of said permit. The facts in this regard are: The permit was granted by the Railroad Commission on February 28, 1941. Blankenship resided and had his office in Oklahoma City. He and Trapp had adjoin-

ing offices, used the same telephone and office employees and owned jointly the lease here involved; but the permit in question was granted to Blankenship alone and notation made on the Railroad Commission's docket that all communications concerning it should be addressed to Blankenship. While it is not shown when the contract with the driller to drill the well was made, Trapp testified that he acted immediately after the permit was granted; that the drilling rig was moved on the lease on March 2, 1941, drilling operations were begun on March 3d, and continued until completion of the well on March 16th; notwithstanding a rule of the Railroad Commission allowing protestants 15 days after a permit is granted in which to file a motion with the Commission for rehearing. On March 4, 1941, Humble, through its attorneys, wired Blankenship that it would bring suit to have the permit set aside. Trapp testified that he did not know of this telegram until a week or ten days after it was sent, because he was in Texas. The Humble did not file its suit until May 29, 1941, some three months after the permit was granted. Blankenship was served on June 3, 1941, but process on Trapp, issued to Oklahoma, was returned with the notation that he was in Texas. He was not served until November 27, 1943, more than two years after suit was filed.

We do not attach controlling importance to this delay in service of process on Trapp, as no issue was made of lack of diligence in *prosecuting* this suit after it was filed, but only as to delay in "the bringing of this suit," the language used in the special issue submitted. The permit was granted to Blankenship alone, obviously with the knowledge, consent and acquiescence, if not with the approval or at the instance of Trapp, since he appears to have spent much of his time in Texas and was frequently before the Railroad Commission in person looking after such matters. That being true, in so far as the suit sought to cancel the permit, a judgment against Blankenship alone, setting aside the permit as invalid, would have been binding on Trapp.

■ Laches is closely related to estoppel and involves many of the same elements.

In 27 Tex.Jur., § 2, p. 16, it is stated that the "Defense of laches rests on an estoppel in pais." For distinctions between laches and estoppel, see 19 Am.Jur., § 38, p. 637. It is clear that there could be no estoppel by contract against the Humble to attack said permit, not only because the contract was invalid, but because the permit in question, according to the testimony of Trapp himself, was not within the terms of such contract. His only ground of estoppel, therefore, must rest entirely upon the delay in "the bringing of this suit."

■ For estoppel to be available as a defense, based upon silence or inaction, "There must be some element of turpitude or negligence connected with the silence or inaction by which the other party is misled to his injury." 19 Am.Jur., § 55, p. 662, and cases cited in support of the text. And in order for Blankenship and Trapp to claim the benefit of estoppel against the Humble, it was incumbent upon them to show that they were misled by the conduct of the Humble to change their position for the worse. That is, that they relied on its delay in bringing this suit to their prejudice. See 17 Tex.Jur., § 9, p. 137; § 15, p. 144, and numerous cases cited in the footnotes.

The Humble notified the permittee, Blankenship, by wire on March 4th, four days after the permit was granted, that it would bring suit to cancel it. Trapp testified that he did not learn of this telegram until a week or ten days after it was sent. He also testified that he acted immediately on said permit after it was granted. That his drilling contractor moved his rig on the property on March 2d and began drilling on March 3d. It is not shown what day he made such drilling contract, if any. Obviously it was made, if he had such a contract, on or before March 2d; though he knew that, under rules of the Commission, the protestant had 15 days in which to file a motion for rehearing before the Commission. And after having started the well immediately upon issuance of the permit, when asked "And you would have completed the well regardless of a petition being filed?" he answered: "Yes, sir, relying upon the Humble's agreement to not bring such action."

While the jury found that appellees incurred heavy expense because of delay in filing such suit, which they would not have incurred otherwise, we think that such finding is not only not supported by the evidence but is contrary to the uncontradicted testimony of Trapp, the only witness who testified on such issue. The evidence shows conclusively, we think, that such expenses were incurred immediately after the permit was granted regardless of any suit being filed; and in sole reliance upon the asserted agreement between Trapp and the Humble. The well was completed on March 16, 1941, and has been a producer since that date. We fail to see, therefore, wherein the delay in filing such suit has prejudiced the rights of the permittee, or wherein he has acted thereon to his injury.

It is now settled law that acts or agreements of private parties cannot be binding upon, nor work an estoppel against, the agencies of the State in the enforcement of its conservation laws. Edgar v. Stanolind Oil & Gas Co., Tex.Civ.App., 90 S.W.2d 656, writ refused. Those are matters in which the public interest controls. In so far as the issue of waste is concerned, therefore, appellees' defenses have no application. However, as above stated, the evidence negatives any issue of waste.

But estoppel to attack a permit, where the facts warrant, is available as a defense where only the correlative property rights of adjacent leaseholders are involved. Stanolind Oil & Gas Co. v. Midas Oil Co., Tex.Civ.App., 143 S.W.2d 138, writ refused; Gulf Land Co. v. Atlantic Refining Co. 134 Tex. 59, 131 S.W.2d 73; Midas Oil Co. v. Stanolind Oil & Gas Co., 142 Tex. 417, 179 S.W.2d 243.

It is upon the two last above-cited cases that appellees chiefly rely; and particularly the language of the Supreme Court as used in the Midas case. The facts of the instant case, however, are clearly distinguishable from those involved in the Midas case. This court is thoroughly familiar with the facts and issues involved in the Midas case, having had that case before us twice on appeal. See 123 S.W.2d 911;

143 S.W.2d 138. In the last-cited publication we reversed it on the rule laid down in the Gulf Land Company case. In neither the Gulf Land Company case nor the last reported Midas case, 179 S.W.2d 243, 245, does the Supreme Court change or modify the general principles governing estoppel. Judge Alexander in the Midas case reiterates and reaffirms the rule stated by Judge Critz in the Gulf Land Company case. That is, to constitute estoppel against an attack on an invalid permit facts must exist which constitute "unreasonable *delay* in appealing orders pertaining to well permits *which cause* the opposite party to *act, to his injury.*" (Emphasis ours.) And in construing the language of the court as used in a decision, it should be interpreted in the light of the facts involved in the case before the court. In the Midas case (see Tex.Civ.App., 123 S.W.2d 911; Tex.Civ.App., 143 S.W.2d 138; Tex.Civ. App., 173 S.W.2d 342; 142 Tex. 417, 179 S.W.2d 243) the permit was granted on June 10, 1935, after protest by Yount-Lee Oil Company, the then owner of the adjacent lease. Thereafter, Yount-Lee transferred its holdings to the Stanolind. The permittee waited four months, without any indication from either of said companies that further action against it would be taken, let a contract to drill on October 10, 1935; and it was not until October 19, 1935, that suit was filed to set it aside. Thus the elements of estoppel were clearly presented; and it was clearly shown that such delay and inaction did cause the Midas to act to its injury. The following language of Judge Alexander in that case is significant: "Both Yount-Lee Oil Company and Stanolind knew that the permit had been granted, but *neither of them gave any notice to Midas of an intention to further contest the permit,* until the filing of the suit hereinafter mentioned." (Emphasis ours.) That is, on October 19, 1935.

In the instant case the Humble, through its attorney, did notify the permittee on March 4, 1941, four days after the permit was granted, of its intention to bring suit to set aside said permit, stating in said telegram, "This notice given in order that you may incur no expense on the faith of the permit until this matter is finally

closed." In the instant case not only did the permittee act immediately on his permit, and obviously, we think, before any suit by Humble could have been filed and citation had; but Trapp testified that he would have gone ahead in any event, whether suit had been filed or not, in reliance upon the *agreement* he had with the Humble. The status of the parties as to estoppel, and their respective rights, were, we think, referable to what transpired between February 28th and March 5, 1941; and not as of the date the suit was actually filed.

Thus, we think, it affirmatively appears as a matter of law that there was no unreasonable delay by Humble in giving notice to the permittee of its intention; but even if its conduct be construed as an unreasonable delay, such delay did not cause appellees to act to their injury, because appellees would have proceeded to drill the well anyway, regardless of such suit. That being true the essential elements of estoppel were lacking; and the findings of the jury in that regard are not only not supported by the evidence but are contrary to the evidence and should be disregarded.

The foregoing conclusions make it unnecessary for us to discuss the other issues raised by appellant as to lack of authority of Rauhut to make such an agreement on behalf of the Humble; improper admission and exclusion of evidence; and misconduct of the jury. It follows, therefore, that the permit attacked should be and is set aside as invalid; and the cause is reversed and remanded to the trial court with instructions to grant appropriate relief in accordance with this opinion.

Reversed and remanded with instructions.

BLAIR, J., dissents.

On Appellees' Motion for Rehearing.

BAUGH, Justice.

Appellees have filed a very able and exhaustive motion for rehearing. In consequence we have given careful reconsideration to the entire record. Three main contentions are particularly emphasized in said motion: 1. That we erred in holding the contract between Trapp and the Humble void and unenforceable because of its being too uncertain and indefinite. 2. That even if unenforceable while executory, it had been fully performed by Trapp by dismissal of his cross-action in such former suit; and consequently the Humble is estopped, having received the benefits thereof, to assert its invalidity. And 3. That we erred in holding that Humble was not guilty of such laches as to bar recovery by it.

We deem it unnecessary to discuss further the enforceability of the contract asserted. If it be conceded that after the contract found by the jury to have been made had been performed by Trapp the Humble was estopped to deny its validity, it still would not apply to the lease here involved. The contract was oral, made over long distance telephone, some eight years before the trial. The recollection of the parties as to details was necessarily not fresh in the minds of the parties. While Trapp did testify that his impression at the time was that it was broad enough to include not only then owned leases, but those subsequently acquired, he admitted that nothing was said about after-acquired leases. In addition to the testimony quoted in our original opinion, he made the following statement upon cross-examination: "The only limitation on it was the extent of my interest was limited to the East Texas field at that time." While Trapp did testify that he owned the lease in question when said contract was made, he was obviously in error. The assignment of said lease to Trapp and Blankenship was in evidence and was dated November 1, 1937, some six months after the contract was made. Consequently, under Trapp's own testimony and the assignment itself, the lease here involved was excluded from the terms of the contract, and so far as the permit here attacked is concerned, it becomes immaterial whether Humble breached it or not.

Hence he is relegated to the issue of laches predicated upon Humble's delay. This we have discussed fully in our original opinion. It is clear, we think, from the rules announced in numerous authorities that the delay complained of must have

induced the complaining party to act; and that such action by him must have resulted in injury. Trapp himself testified that he acted upon the faith of his contract with Humble; and that he would have done the same thing regardless of whether such suit had been filed immediately. Hence such delay did not induce him to act. What, then, was his injury? Appellee contends that if Humble had acted promptly he would have been saved at least a part of the expense of completing and casing his well; and that to invalidate the permit now would result in a loss to appellees of the value of their well. However, because of the immediate and determined action of Trapp in drilling said well, in sole reliance upon his agreement with Humble, and the compliance with Sec. 10 of Art. 6049c, Vernon's Ann.Civ.St., which must be had before ancillary relief by injunction could have been obtained; and Trapp's own testimony that a suit to set aside said permit would not have stopped him from continued drilling; his contention is, we think, clearly untenable. He would and could have completed the well in any event before the Humble could have stopped him by promptly filing such suit. And, had it done so, under the conclusions compelled by the evidence, that, as a matter of law, his permit was invalid, the result would have been that he would have suffered the loss of all moneys expended by him in drilling under such invalid permit. In contemplation of law then he has, we think, suffered no damages by Humble's delay which he would not have suffered in any event.

The motion for rehearing is therefore overruled.

Overruled.

BLAIR, Justice.

I respectfully dissent from the majority holding that as a matter of law there was no evidence to sustain the jury's findings (1) that Humble unreasonably delayed the bringing of this suit to test the validity of the permit to drill the well, and (2) that by reason of such delay heavy expenses were incurred in drilling the well which would not have been otherwise incurred. If such defense of laches or estoppel were

established, the questions of whether the well was necessary to prevent confiscation or waste, or whether Humble was estopped by contract not to interfere by suit with Trapp's future operations in the East Texas field, become immaterial.

If the majority holding is correct that the defense of estoppel by contract was not established, the holding is immaterial. Such holding can be sustained, however, only upon the theory that there can be no estoppel by contract, as to matters not included in the contract, and that the lease in question was not so included, because Trapp did not own it when the contract was made. Trapp testified that "the well in question was owned by me at the time." This testimony was given on cross-examination as to whether the contract covered after-acquired leases.

It is my view, however, that the defense plead, proved, and found by the jury in answer to Special Issues Nos. 3 and 4 was not one of estoppel by contract, but was one of equitable estoppel or estoppel in pais, arising out of the agreement not to interfere by suit with Trapp's future operations in the East Texas field and the facts and circumstances of this case. This was the second defense set up to this suit, but will be first discussed, because the majority have so discussed it.

The substance of the agreement as alleged and testified to by Trapp will be here stated. In 1937 there was pending in the district court of Travis County a Rule 37 case or suit, being cause No. 55,598, styled Humble Oil & Refining Company v. Railroad Commission and M. E. Trapp. The suit involved different leases from those involved in the instant case. Trapp had filed a cross-action against Humble in said cause No. 55,598, alleging that Humble had over produced its lease in violation of the rules and regulations of the Railroad Commission, and prayed for an injunction to restrain Humble from any further production of oil from its lease, or at least until the injuries to Trapp's lease had been equalized. Mr. J. A. Rauhut was one of the attorneys representing Humble, and Mr. Tom Pollard represented Trapp in the foregoing litigation. An agreement was

reached to dismiss both the suit of Humble and the cross-action of Trapp with prejudice, which the judgment recited was done. Trapp's version of the agreement was as follows:

"A. Mr. Rauhut insisted upon dismissing it and wanted to know what I wanted him to do. He said, 'We don't want to try the law suit, and we will do anything you want us to do; that we can not win the law suit and want to have it dismissed and disposed of, and what do you want us to do.' I was somewhat of the opinion that the cross-action ought to have been tried, but he was very nice about it and said if we would dismiss it they would pay the costs in the matter and hold me harmless from any expense by reason of it, and he agreed then not to bring any more actions against me or interfere with my operations in the field. That if they had any grievance they would see me personally about it and thresh it out personally without jumping into court on each occasion that occurred; and under those circumstances I told him to tell Mr. Pollard I would agree to dismiss it on those terms. Later I called Mr. Pollard and told him I had talked to Mr. Rauhut about it and Mr. Rauhut had agreed that they would not annoy me or interfere with my operations in the East Texas Field any further and that we would get along.

"Q. Now Governor, does that correctly state the agreement you had with Mr. Rauhut? A. Yes, sir.

"Q. Following the dismissal of that case and that cross-action of yours—by the way, that cross-action that you filed had to do with your claim that they had been running excess oil, I believe? A. Yes, sir.

"Q. Now following that dismissal of your cross-action, did you secure any additional permits in East Texas? A. Yes, sir, that was part of the agreement at that time. I called his attention to the fact that I was preparing to apply for additional permits, and that he agreed not to oppose those permits—or at least he agreed not to go into court. He said under the circumstances he would be obligated to file a protest with the Railroad Commission but he would not press it, and within a short time afterwards the application was filed with the Railroad Commission for additional permits and Mr. Rauhut I think appeared personally and filed a mild protest but made no further objection and the Commission granted the permits and the wells were drilled and no further disturbance was had.

"Q. Has the Humble up until the time this present law suit was filed, had they filed any law suits against you seeking to set aside Rule 37 permits? A. From the time of the agreement the Humble strictly complied with that agreement up until the filing of this law suit which was several years later."

After it was shown that Trapp and Blankenship did not acquire their interest in the lease in suit until about six months after the foregoing agreement was made, Trapp testified on cross-examination that it was sufficiently broad to cover after-acquired leases, as follows:

"Q. I want to see how far he pledged according to your memory, how far he pledged the Humble's; did he pledge them as to any leases that you might thereafter acquire any interest in? A. I would say that it was sufficiently broad to cover that.

"Q. What did he say about that? A. It was a telephone conversation and it was brief and I do not recall of anything being said about that. In fact I am sure there was no question of any additional lease that I might acquire.

"Q. In other words as to leases you might get in the future you don't believe Mr. Rauhut pledged the company that they never would file a law suit regardless of what you might acquire in the future. A. The well involved in this litigation was owned by me at the time.

"Q. I am just trying to define the limits of his agreement. A. I think it was sufficiently broad to cover any lease I might thereafter acquire. Nothing was said necessarily."

Defendants alleged the agreement to be that Humble would not thereafter interfere by court action with Trapp's drilling and producing oil "from such leases in East Texas in which he was an owner." Special Issue No. 3 submitted the issue in the same

language and the jury found that the agreement was so made.

And in answer to Special Issue No. 4 the jury found that Trapp drilled the well in question, relying in good faith on such agreement.

While there is a rule that "an estoppel by simple contract cannot be predicated on an invalid contract, unless it has been fully executed," it is also the settled rule "that a party to an invalid contract which is not illegal and unlawful may be equitably estopped to dispute the validity of the contract." 31 C.J.S., Estoppel, p. 234, § 57. This rule is known as the doctrine of equitable estoppel or estoppel in pais, which terms many modern authorities use interchangeably. 31 C.J.S., Estoppel, § 59, p. 240; 19 Am.Jur. 633, 634, §§ 33 and 34; and Lockhart State Bank v. Baker, Tex. Civ.App., 264 S.W. 566. Such doctrine of equitable estoppel or estoppel in pais applies where the party asserting such estoppel has performed his part of the contract in reliance on the conduct and assertions of the other, amounting to representations that the contract will be performed. City of Eureka v. Kansas Electric Power Co., 133 Kan. 238, 299 P. 938; Id., 133 Kan. 708, 3 P.2d 484. An equitable estoppel or estoppel in pais does not rest upon legal obligation, and it may be based in part upon an invalid contract partly performed, and upon facts and circumstances making it unfair and inequitable to set up the invalidity of the contract. Dunham v. Chatham, 21 Tex. 231, 73 Am.Dec. 228; Dallas Lbr. Co. v. Golde, Tex.Com.App., 12 S.W.2d 187. The doctrine of equitable estoppel or estoppel in pais, as applied to partly performed invalid contracts, is stated in 19 Am.Jur. 685, 686, as follows: "Such estoppel operates to prevent the party thus benefited from questioning the validity and effectiveness of the matter or transaction in so far as it imposes a liability or restriction upon him, or in other words, it precludes one who accepts the benefits from repudiating the accompanying or resulting obligation."

As is pointed out by this text and the many decisions there cited, the rule or principle stated finds application in many fields and circumstances. I think the rule has particular application to the foregoing facts and circumstances of this case, which fully establish every element of equitable estoppel or estoppel in pais.

It is undisputed that an agreement was made whereby Trapp was to dismiss his cross-action or suit against Humble with prejudice, which he did, thereby fully performing his part of the agreement. If Trapp had not dismissed his suit and had prevailed therein, Humble's losses would no doubt have been heavy, aside from the deleterious effect of having been found to have violated the rules and regulations of the Commission and the Conservation Laws of this State.

Humble knew that Trapp owned a half interest in the lease; and that he appeared before the Commission and sought the granting of the permit,—Blankenship not appearing except by counsel who represented both Trapp and Blankenship.

Humble conceded that it had some sort of agreement with Trapp about dismissing his cross-action against it in cause No. 55,598. Trapp testified that the agreement with Humble's attorney was that "if we would dismiss it they would pay the costs in the matter and hold me harmless from any expense by reason of it, and agreed then not to bring any more actions against me or interfere with my operations in the field. That if they had any grievance they would see me personally without jumping into court on each occasion that occurred." There is nothing invalid about this agreement and the evidence shows that it was contemplated that Trapp would file in the future applications for permits to drill wells under exceptions to the general spacing rule, that several of them were granted, that although appellant protested the granting of several wells by the Commission, it did not file suit to set them aside, and that appellant observed the agreement for several years.

Trapp further testified that he began immediately the drilling of the well, relying in good faith on such agreement; and that for that reason he would have drilled the well even if he had had notice of the telegram to Blankenship, but of which he had

no notice until about two days before the well was completed, which had cost approximately $10,000.

The majority concede in their opinion that "the evidence shows conclusively, we think, that such expenses were incurred immediately after the permit was granted regardless of any suit being filed; and in sole reliance upon the asserted agreement between Trapp and the Humble."

The jury found that Humble agreed, in consideration of the dismissal of his cross-action charging it with producing excess oil, not to interfere by suit with Trapp in his drilling for and producing of oil from his leases in the East Texas field; and that Trapp drilled the well in question, relying in good faith on such agreement. Thus the defense of equitable estoppel or estoppel in pais was established in every particular.

The contract asserted by Trapp is not illegal nor in violation of any public policy of this State. It related solely to the correlative rights of the adjacent leaseholders. It in no way attempts to interfere with the agencies of the State in the enforcement of the conservation laws. The contract was to the effect that if the Commission granted Trapp a permit to drill a well as an exception to Rule 37, appellant agreed not to interfere by court action with his use of such permit. A permit to drill an oil well is presumed to be valid. "It is made so by statute, and being an official act, would be presumptively valid." Magnolia Pet. Co. v. Railroad Commission, 130 Tex. 484, 109 S.W.2d 967, 972; Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393. The statutes give an interested adjacent leaseholder the right to appeal from the order, which is solely to protect his correlative rights. It was such correlative rights to which the contract in suit related. In the case of Railroad Commission v. Mackhank, 186 S.W.2d 351, 360, this court say: "We can see no valid reason why adjoining lease owners may not contract with regard to their correlative rights with the same freedom, after as well as before the enactment of our conservation laws, so long as such contracts are limited to correlative rights, and in no way infringe upon the proper administration of the conservation laws of the state."

The first defense plead was laches or estoppel arising from the delay of appellant in bringing this suit or proceeding to test the validity of the order granting the permit to drill the well in question. Such defense of laches or estoppel is defined in the case of Midas Oil Co. v. Stanolind Oil & Gas Co., 142 Tex. 417, 179 S.W.2d 243, to in substance mean that an adjoining leaseholder who does not proceed with reasonable diligence under the provisions of Sec. 8 of Art. 6049c, V.A.C.S., to contest the validity of a permit issued by the Railroad Commission to drill an oil well as an exception to Rule 37, loses the right to do so, if the permitee has acted thereunder by incurring obligations in drilling the well. Such defense was plead by appellee as follows:

"Defendants allege that the permit, as alleged by plaintiff, was granted on February 28, 1941, and that this suit was not filed until the 29th day of May, 1941, one day more than three months after the granting of the permit. Moreover, service was not had on the defendant Blankenship until June 3, 1941, and service was not had on the defendant Trapp until November 27, 1943. Defendants allege that this was not and is not a reasonable time within which to prosecute an appeal from an order of the Railroad Commission granting said permit, but is an unreasonable delay in the filing of said suit and in securing service thereon.

"After the granting of said permit and prior to the filing of this suit, without receiving any notice of the intention on the part of plaintiff to file this suit, defendants contracted for and completed an oil well pursuant to said permit on said lease at a cost of approximately $10,000. Said well was producing oil prior to the filing of the suit, is producing oil at this time, and defendants have contracted for and are selling, and have been selling at all times material herein, the oil produced from said well, and did contract for the sale thereof prior to the filing of this suit.

"Plaintiff, therefore, has been guilty of laches and an unreasonable delay in bringing this suit, and should not therefore be permitted to prosecute the same and the relief for which plaintiff prays should therefore be denied.

"Defendants, as above alleged, having acted in good faith on said permit to their detriment, and having expended a large sum of money and made contracts with reference thereto, plaintiff is and should be estopped to prosecute this suit."

The facts and circumstances adduced under the foregoing pleadings were in substance as follows:

Blankenship and Trapp were the joint owners of the oil and gas lease on the 2.08-acre tract, which fact was known to appellant. The permit was issued by the Commission after a hearing, appellant appearing through counsel and protesting, on February 28, 1941. Immediately upon the issuance of the permit Trapp, who appeared at the hearing and urged the granting of the permit, began drilling operations, the actual drilling of the well beginning on March 3, 1941, and it was completed as a producer of oil on March 16, 1941. This suit was filed by appellant on May 29, 1941, three months and one day after the date of granting the permit to drill the well, and sixty-four days after the completion of the drilling of the well and the production and sale of oil therefrom began. Citation was issued to both Blankenship and Trapp, and sent to an officer in Oklahoma City, Oklahoma, which was the residence of Blankenship and Trapp, for service. The officer's return shows service on Blankenship on June 3, 1941, and that Trapp was not served because he was in Texas at the time. Trapp was not served with citation herein until November 27, 1943, more than two years after the filing of this suit, and about two and a half years after the permit to drill the well was granted. During that time he was in Oklahoma about one-half of the time and in Texas the other part of the time. This fact was known to Humble's attorney, who had made the agreement for Humble with Trapp not to interfere by suit with Trapp's operations in the East Texas Field, and who was also one of the attorneys bringing the instant suit, and who was also shown to have had general supervision of most of Humble's Rule 37 matters, both before the Commission and in the courts. No showing was made as to why the citation was not earlier served upon Trapp. Humble alleged that it knew that it was the practice of Trapp to drill his wells immediately after being granted a permit by the Commission, and this fact Humble reiterates in its brief. Trapp testified that he drilled the well immediately and in reliance upon his agreement with Humble that it would not interfere by suit with his future operations, and that because of the agreement he would have drilled the well even if he had known of the telegram to Blankenship, which he did not know of until some two days before the well was completed.

The telegram referred to was signed "Powell, Rauhut & Gideon," dated March 4, 1941, was sent from Austin, Texas, to G. T. Blankenship, Oklahoma City, Oklahoma, and received by him on that date, and stated that Humble Oil & Refining Company will appeal to the District Court of Travis County from the order granting the permit to drill the well in question, and that "this notice given in order that you may incur no expense on the faith of permit until this matter closed." No such notice was given to Trapp. He was in Texas attending to the drilling operations at the time, and learned of the telegram to Blankenship for the first time on March 14, 1941, two days before the completion of the well as a producer of oil on March 16, 1941. Prior to this notice large sums of money, approximately $10,000, had been expended in the drilling operation; and prior to the filing of the suit and after the completion of the well contracts were made for the sale of the oil from the well, and the oil had been so sold prior to the filing of this suit and continuously since the filing of this suit.

The record shows that the drilling activities of Trapp were within a few hundred feet of appellant's adjacent leasehold, and no showing was made that Humble's employees there did not know of them.

The jury found from a preponderance of the evidence that the foregoing facts and circumstances showed that appellant unreasonably delayed the bringing of this suit; and that defendants would not have incurred the heavy expenses they did but for that delay. I think the facts and circumstances were such as to make these questions for the jury, and fully support its findings.

Our courts have uniformly held that laches or negligent delay in bringing a suit is not established by any set standard or rule, but from the facts and circumstances, the nature of the suit or proceedings, and the subject matter involved in each case. A delay of several years in bringing a suit may not be of serious consequence in one character of case, whereas a delay for a short time may be so in another case. See Campbell v. McFaddin, 71 Tex. 28, 9 S.W. 138; Malakoff Gin Co. v. Riddlesperger, 108 Tex. 273, 192 S.W. 530; Culver v. Pickens, 142 Tex. 87, 176 S.W.2d 167; Murphy v. Johnson, Tex.Civ.App., 54 S.W. 2d 158, error dismissed; Los Angeles Heights School Dist. v. Chestnut, Tex.Civ. App., 287 S.W. 693. In the case of Reed's Adm'r v. West, 47 Tex. 240, the court held that "what is a reasonable time must depend much on the circumstances of each case." These decisions are uniform in holding that what is a reasonable time is usually a question of fact for the jury to determine in each case.

In other jurisdictions it has been held that as applied to delay there is a close relationship between estoppel and laches, and that estoppel by delay includes laches arising from negligent delay; and that: "Although a slight delay is less likely than a more extended one to be considered a ground for estoppel, it should be observed that the question whether a delay is such as to give rise to an estoppel can never be determined merely by measuring the length of the delay in days or months or years, since what would be inexcusable delay in one case might not be inconsistent with diligence in another." 19 Am.Jur. 669. § 59.

In dealing with the particular kind of delay here involved our courts have used the terms estoppel and laches interchange-ably, and have followed the foregoing rules and principles.

In the case of Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73, 86, the court say: "* * * that unreasonable delay in appealing orders pertaining to well permits which cause the opposite party to act, to his injury, might give rise to a question of estoppel."

In the Culver case, supra [142 Tex. 87, 176 S.W.2d 171], the Supreme Court held that the pleadings raised an issue of laches; and that: "It is a matter of common knowledge that oil properties are subject to great fluctuation in value, and that the production of oil involves large expenditures of money. Those facts should properly be given weight in determining the question of whether a cause of action is barred by laches."

The facts and circumstances of the instant case are similar to and in some respects stronger than were the facts in the case of Midas Oil Co. v. Stanolind Oil & Gas Co., 142 Tex. 417, 179 S.W.2d 243, 245, which like the instant case was a statutory appeal or proceeding to test the validity of a permit to drill a second well on a 2.14-acre tract of land, the permit having been granted by the Commission under the exception to Rule 37 to prevent confiscation and waste. The Midas suit was filed four months after the permit was granted, but four days before the well was completed. The court held that the permit to drill the well was prima facie valid; that in the very nature of the circumstances the permittee was entitled to, and that it should have been contemplated by any interested party that Midas would, immediately use the permit; and that it was a question of fact for the jury to determine whether the delay in bringing the suit or proceeding to set aside the permit was unreasonable. As reason for the rule the court held as follows: "When a permit to drill a well is granted, the very nature of the circumstances are such that all persons interested therein should contemplate immediate use of the permit by the permittee. Oil is fugitive in its nature, and unless it is captured within a reasonable time it may be drained off by adjoining leaseowners and lost.

Delay in drilling the well would inure to the benefit of the prospective contestant for in the meantime he might be draining off permittee's oil. Moreover, the value of oil properties fluctuates rapidly. If the permit is to be of any value to the permittee it is necessary that the well be drilled at once. On the other hand, a large sum of money is required to drill and bring in a well. The well, when drilled, may be a producer or it may be a nonproducer, in which latter event the investment is a complete loss. The permittee cannot afford to delay, for if he does his oil may be drained off, yet he incurs a risk if he proceeds under the permit. Consequently the permittee is forced to elect at his peril. All the circumstances would seem to demand that if an adjoining leaseholder desires to contest such a permit, he should proceed with reasonable diligence, and if he does not do so, and the permittee acts under the permit by incurring obligations in the drilling of a well, the contestant should be held to have lost his rights to contest the permit."

In the Midas case the suit was filed four months after the permit was granted, but four days before the well was completed. In the instant case the suit was filed three months after the permit was granted, but sixty-four days after the well was completed. In the Midas case the Supreme Court further say: "While the Act in question does not fix any time limit for the filing of a suit to set aside such a permit, it does provide that 'Such suit shall be advanced for trial and be determined as expeditiously as possible and no postponement thereof or continuance shall be granted except for reasons deemed imperative by the Court.' This very clearly evidences legislative recognition of the necessity of speedy action in such matters, and we are satisfied that it was the intention of the Legislature that such a suit should be filed within a reasonable time after the granting of the permit, and if an interested party fails to bring such suit within a reasonable time, and in the meantime the permittee begins the drilling of the well or otherwise incurs substantial obligations in the prosecution of his rights thereunder, the contestant should

be held to have lost his right to prosecute such a suit."

The majority opinion seeks, however, to distinguish the instant case from the Midas case on the facts. In arguing to this point both appellant and the majority opinion emphasize the fact that Humble's attorney sent a telegram to Blankenship on March 4, 1941, stating that Humble intended to bring suit to contest the validity of the permit to drill the well. Emphases are also placed upon the fact that Trapp began drilling operations immediately after the permit was granted and before the fifteen days allowed by the rules of the Commission to file a motion for a rehearing of the matter; and that Trapp testified that he drilled the well immediately because he was relying upon the agreement with Humble not to interfere by suit with his operations in the East Texas field.

Humble did not file a motion for rehearing under the fifteen-day rule of the Commission, and offered no proof showing why it did not do so. The filing of such a motion was entirely optional with appellant, and its right of appeal from the order in question is in no way affected by the fact that it did not file such a motion. Four days after the permit was granted and after drilling began, Humble's attorney wired Blankenship that it intended to bring a suit contesting the permit; which it did not do until almost three months later, and sixty-four days after the well was completed. Humble did not give Trapp any notice that it intended to contest the permit by court action. He was on the lease directing the drilling operations, and was there on March 3, 1941, when the actual drilling of the well began, and was in Texas and did not know of the telegram to Blankenship until about ten days after it was sent, or until about March 14, 1941, two days before the well was completed on March 16, 1941. Humble offered no proof that it did not know of these drilling operations.

The issues raised by the pleadings and proof were whether Humble unreasonably delayed the bringing of this suit, and whether by reason of such delay appellees incurred heavy expenses which they would

not have otherwise incurred. The fact that Humble's attorneys sent Blankenship a telegram that it intended to sue him to set the permit aside did not as a matter of law authorize the delay in filing the suit of more than three months and until sixty-four days after the well was completed. Manifestly the rights of the parties could not be fixed by reason of the fact that one sent the other a telegram threatening to sue him. It is the reasonableness of the time in the filing of the suit that determines the rights of the parties. The sending of the telegram to Blankenship was admissible for whatever it was worth to the jury in determining whether appellant showed any excuse for its delay of more than three months in bringing this suit. The fact that counsel for Humble sent the telegram showed nothing more than that Humble intended to sue; just when was not stated. Trapp was not sent a telegram; nor was any notice given to him that Humble intended to sue him. On cross-examination of Trapp on this issue of laches, appellant sought and obtained his answer that he would have drilled the well immediately as he did, because he relied upon his agreement with appellant not to interfere with his operations by court action. Thus appellant attempted to show its reason for its delay in filing the suit because it sent the telegram to Blankenship. Trapp showed that he knew nothing of the telegram until about two days before the well was completed; and that his reason for drilling immediately was because he thought he had a contract with Humble not to sue him, and that it would instead personally contact him as to any difference which might arise. Humble knew Trapp owned an interest in the lease, and that he was present when the application of Blankenship for the permit was presented. Humble made no showing that it did not know of Trapp's presence and development activities on the land.

Further in this connection Humble alleged that it knew that it was the practice of Trapp to drill his wells immediately upon being granted a permit, and it reiterated this fact in its brief. Trapp was on the lease in Texas, and he was never actually given any notice that Humble

intended to bring suit to test the validity of the permit. He learned of the telegram to Blankenship about two days before the well was completed. Appellant's adjacent lease was only a few hundred feet from the tract in question where the drilling operations were taking place.

The record also shows that the attorney for Humble, who had general supervision over all its Rule 37 matters and who lived in Austin, knew that Blankenship and Trapp were represented before the Commission by Mr. E. L. Looney, an attorney at Austin, but made no attempt to notify him of Humble's intention to sue to test the validity of the permit; which the record shows that he could have easily done by telephone. The record also shows that said attorney for Humble had instituted many Rule 37 suits, not only for Humble but for others, testing the validity of permits granted as exceptions to Rule 37 to prevent waste or confiscation; that the record of the hearing before the Commission for the permit in question was prepared and available to said attorney about a week before the permit was granted. It is a matter both of common and judicial knowledge that Rule 37 cases are neither new nor novel.

It is also a matter of judicial knowledge that hundreds of Rule 37 cases have been filed, and that temporary restraining orders have been granted to restrain the drilling of a well until a hearing may be had, and that such action is not necessarily complicated nor lengthy; and since appellant did not file this suit until more than three months after the permit was granted to drill the well and sixty-four days after it was completed, within a hundred or so feet of its adjoining land, I think the evidence fully sustains the jury's findings on the issue of laches and estoppel arising from unreasonable delay in filing this suit or proceeding.

The testimony is also undisputed that Trapp had incurred obligations for drilling the well in suit even before the telegram was sent, and heavy expenses were incurred before Trapp had any notice of the telegram, and all of the expenses were incurred before the filing of the suit; and,

as was said in the Culver case, supra, "it is a matter of common knowledge * * * that the production of oil involves large expenditures of money." The majority opinion necessarily substitutes this appellate court's findings of fact for the jury's findings of fact on these issues.

The fiction of law stated by the majority opinion that notice to Blankenship that it intended to contest the permit was in law notice to Trapp; and the further statement that Humble could have as a matter of law proceeded against Blankenship, the nominal permittee, alone to set aside the permit, have no place in the issues or defenses of equitable estoppel and laches asserted by Trapp. Humble knew that Trapp and Blankenship owned the lease in question jointly, and as such joint owners sued them to set aside the permit issued in the name of Blankenship, alleging that it knew that it was the practice of Trapp to begin drilling operations immediately upon being granted a permit. Humble also knew that it had an agreement of some sort with Trapp not to interfere with his future operations by suit, but would contact him personally as to any differences that might arise between them. Having so sued Trapp, Humble is estopped to deny that he was a necessary party. Having been so sued, Trapp manifestly was entitled to set up his defenses of equitable estoppel and laches herein.

A complete analogy to these questions is shown in the case of Cain v. Bonner, 108 Tex. 399, 194 S.W. 1098, 1099, 3 A.L.R. 874, wherein plaintiff sued upon loan renewal agreements which were subject to the defense of usury, whereas the original indebtedness was not subject to such defense. The court held that "having declared upon the renewal agreements, the plaintiff's right of recovery was measured by them. He could not avail himself of their benefits without subjecting his action to the defenses which they afforded. The ordinary principles of estoppel would deny to him the appropriation of only their favorable results."

Appellees alleged that appellant unreasonably delayed the filing of this suit and the securing of service of citation on Trapp therein. The facts relating to the time of filing the suit and the service of citation on Trapp were shown without dispute. These facts were pertinent to the issue of delay in filing the suit, and especially so in view of the contention of appellant that it did not unreasonably delay the filing of the suit, and that when it did file the suit its rights were forever fixed thereby. Manifestly the jury had the right to consider the fact that it did not serve Trapp for more than two years as bearing upon the issue that Humble unreasonably delayed the filing of this suit.

It is my view that no error requiring a reversal of this case was shown, and that the judgment of the trial court should be affirmed.